Filed 7/29/22  In re A.C. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re A.C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>T.C.,<br><br>      Defendant and Appellant.<br><br>A.C.,<br><br>      Objector and Appellant. | D080009<br><br>(Super. Ct. No. J520041) |

APPEAL from orders of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant T.C., Mother.

Jamie A. Moran, under appointment by the Court of Appeal, for Objector and Appellant A.C.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Respondent Jay C., Father.

Office of County Counsel, Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

I

INTRODUCTION

The San Diego County Health and Human Services Agency (the Agency) initiated a juvenile dependency proceeding after receiving a report that T.C. (Mother) and Jay C. (Father) were neglectful in the care of their eight-year-old twins, A.C. and J.C. (together, the Minors). Subsequently, the Agency learned Father sexually abused J.C., and Mother failed to protect her from the sexual abuse. After an 18-month reunification period, the juvenile court terminated reunification services and set a selection and implementation hearing.

Thereafter, the juvenile court: (1) granted a petition filed by the Agency under Welfare and Institutions Code section 388,[1] which requested supervision for Mother's visitations with the Minors; and (2) denied a section 388 petition filed by Mother, which requested placement of the Minors in her care or, alternatively, additional reunification services. Mother and A.C. appeal the orders granting the Agency's section 388 petition and denying Mother's section 388 petition.

We affirm.

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

2

II

BACKGROUND

A. *The Initial Dependency Petitions*

The Agency received a report from the San Diego County Sheriff's Department that the Minors, who were eight years old, were the victims of neglect. Father, Mother, and the Minors lived behind a retail complex in tents, which lacked a toileting facility and were exposed to the elements. When law enforcement officers and a social worker visited the tent site, they observed that the Minors were filthy, A.C. was smoking a cigarette, the family's tents were full of trash, and J.C. was not wearing shoes even though there was broken glass on the ground.

The Minors reported they did not eat meals and they ate unhealthy snacks instead. Neither Mother nor the Minors could recall the last time the Minors visited a doctor or dentist, and J.C. complained of dental pain. Father admitted he drank alcohol and the social worker observed alcohol containers in the tents. Further, J.C. reported that the maternal grandfather sexually abused her years earlier and Mother was aware of the abuse.

The Agency filed dependency petitions on behalf of the Minors alleging they suffered, or there was a substantial risk they would suffer, serious physical harm or illness under section 300, subdivision (b)(1). The juvenile court made prima facie findings on the petitions, ordered reunification services for the parents, and detained the Minors out of the parents' care. The Minors were initially detained at Polinsky Children's Center and then placed in a foster home.

B. *The Jurisdiction and Disposition Hearing*

In interviews with the social worker, J.C. stated "camping" with her family in tents was "terrible, terrible." She stated Father drank alcohol and her parents would "fight" and "get hurt" when he drank. However, Mother

stated Father "would only drink once or twice a month" because he did not have money to pay for alcohol.

J.C. also stated the maternal grandfather touched her "many times" before they moved to San Diego. In a forensic interview, J.C. stated Mother was present when the sexual abuse occurred. According to J.C., Mother told her not to reveal the abuse to anyone or she would go to "juvie." By contrast, Mother told the social worker she did not learn about the abuse until after it occurred. She stated she did not have further contact with the maternal grandfather after she learned of the abuse.

A.C. told the social worker his family had little food and no money. He disclosed that Father used to drink alcohol, but claimed he had quit drinking. He stated he missed his parents and wanted to stay with them.

At the initial jurisdiction and disposition hearing, the juvenile court found Father was the Minors' presumed father. After a contested jurisdiction and disposition hearing, the court sustained the petitions and declared the Minors dependents of the court. The Minors remained placed in their foster home and the court ordered reunification services for the parents.

C. *The Six-Month Review Hearing for the Initial Dependency Petitions*

During the initial reunification period, Mother made progress on her case plan. She attended therapy sessions, completed an in-home parenting education program, and submitted negative drug tests to the Agency. She remained unemployed and unhoused, but worked with agencies to obtain housing. She had consistent and appropriate visitations with the Minors and her visitation was elevated to unsupervised visitation.

Father made some progress on his case plan, though not as much as Mother. He attended therapy sessions, completed an in-home parenting education program, and had regular, appropriate visitations with the Minors. His visitation was even elevated temporarily to unsupervised visitation.

4

However, Mother notified the social worker she broke up with Father because he was drinking alcohol again. Father later admitted his continued alcohol use to the social worker. Based on these revelations, Father's visitation reverted to supervised visitation. Father remained unhoused, though he too worked with agencies to obtain housing.

At the six-month review hearing, the juvenile court continued the Minors as dependents, ordered they remain placed in their foster home, and ordered additional reunification services. The court also granted Father structured unsupervised visitation pending a clean drug test.

D. *The 12-Month Review Hearing for the Initial Dependency Petitions*

During the second reunification period, Mother completed the services outlined in her case plan. She obtained temporary housing and continued working with agencies to find permanent housing. She had consistent and appropriate unsupervised visitations with the Minors, including in-person visitations prior to the COVID-19 pandemic and telephone and video calls with the Minors during the COVID-19 pandemic.

Mother and Father briefly rekindled their relationship, but then ended it. After the breakup, Mother told the social worker Father had been drinking alcohol throughout the dependency case and they had not been truthful with the Agency about his drinking habits. She also told the social worker she intended to maintain strong boundaries with Father and would not allow him back into her life. She said she would not "let him be the reason [she] los[t] [her] babies."

Father admitted to the social worker he had a drinking problem. He also tested positive for methamphetamine twice. Based on Father's alcohol use and drug test results, the Agency filed a section 388 petition to require supervision during his visitations with the Minors.

At the 12-month review hearing, the juvenile court continued the Minors as dependents, ordered they remain placed in their foster home, and ordered additional reunification services for the parents. The court reverted Father's visitation to supervised visitation pending a contested hearing on the Agency's section 388 petition.

E. *The 18-Month Review Hearing and Subsequent Dependency Petitions*

A few weeks after the 12-month review hearing, Mother and the Minors participated in an unsupervised video call. During the call, Father—who did not have unsupervised visitation rights—appeared on-screen next to Mother. Mother told the Minors to be quiet so their foster mother would not be alarmed by Father's presence.

That evening, J.C. disclosed to her foster mother that Father sexually abused her when she was between the ages of six and eight years old. She disclosed he would "do stuff to her," including putting his "bad spot" in her "front" and "backside." The foster mother asked J.C. why she did not tell Mother and she replied that Mother "wouldn't do anything about it." She added that Mother used to "look under the covers and see [Father] doing that to [her]." She stated she had nightmares Father would "kill her" if she told anyone about the abuse.

The following day, the social worker made an unannounced visit to Mother's new apartment. When Mother answered the door, the social worker observed Father's belongings and empty alcohol containers. The social worker asked if Father was there and Mother denied he was there. With Mother's permission, the social worker searched the apartment. She found Father hiding inside in a closet.

A few days later, J.C. disclosed Father's sexual abuse to the social worker. She stated he "put his bad spot" under her clothes, inside her panties, and inside her butt. She reported Mother "knew about it and they

were whispering the whole time" it happened. She stated her "mom should have stopped him." Over the following week, J.C. repeated her disclosures to another social worker and a forensic interviewer. She indicated she wanted supervision for her visitations because she was scared her parents would spank her for disclosing the abuse.

Two social workers interviewed Mother, told her about J.C.'s sexual abuse allegations, and recommended she seek out a restraining order against Father. Mother said she believed J.C. had been abused by Father, but denied she was previously aware of the abuse. When told that Father was a barrier to reunification, Mother stated he had not "been around" and it would "not happen again." She added that she would do "whatever it takes to protect" the Minors. Mother stated she spoke to her attorney about a restraining order and would notify the police if Father came to her home.

Based on J.C.'s disclosures, the Agency filed a subsequent dependency petition under section 342, alleging J.C. had been sexually abused, or there was substantial risk she would be sexually abused, pursuant to section 300, subdivision (d). The Agency also filed a subsequent dependency petition for A.C., alleging there was a substantial risk he would be abused in the same way as J.C., under section 300, subdivision (j).

At the detention hearing on the subsequent petitions, the juvenile court made prima facie findings and ordered the Minors detained in their foster home. It also ordered Father to have no contact with the Minors. Thereafter, the Agency filed a section 388 petition to modify the existing visitation orders and formally revert Mother's visitations back to supervised.

After the detention hearing, Mother and the social worker spoke over the phone and Mother stated she had not seen or spoken with Father. However, just a week later, the Agency learned about a domestic dispute

between Father and Mother that had occurred two weeks earlier. According to a police report, Father showed up intoxicated at Mother's apartment and asked for money. They argued and Father tried to punch out the window of Mother's vehicle. When the social worker asked Mother why she did not report the incident to the Agency, she stated she had forgotten about it.

At the initial jurisdiction and disposition hearing on the subsequent petitions, the Agency amended its still-pending section 388 petition regarding Father, and asked that he have no contact with the Minors. The court made prima facie findings on the Agency's section 388 petitions, and it issued interim orders prohibiting Father from contacting the Minors and requiring supervision for Mother's visitations pending trial. The court set a single court date for the 18-month review hearing on the initial dependency petitions, the contested jurisdiction and disposition hearing on the subsequent dependency petitions, and the hearing on the Agency's section 388 petitions.

Over the next few months, the Minors experienced upheaval in their placement. The foster mother with whom they had been placed for the prior 18 months was unable to continue caring for them, so the Agency placed them in a new foster home. Soon after, the Minors' new foster parents told the Agency the Minors had damaged their property and they were unable to follow the house rules. Therefore, the Minors were removed and placed at Polinsky Children's Center. A short time later, the Minors were placed in yet another foster home.

Meanwhile, Mother obtained employment and maintained housing. She also began participating in nonprotective parent sexual abuse classes with a therapist. As part of her classes, Mother agreed to follow a safety plan requiring her to refrain from having contact with Father. Notwithstanding

8

Mother's progress, she did not follow the Agency's recommendation to seek out a restraining order. She claimed a restraining order would not be helpful because Father was homeless and she did not think she would be able to serve him with the necessary legal paperwork.[2]

At the omnibus hearing, the court denied the Agency's section 388 petitions, but sustained the subsequent dependency petitions. With respect to the 18-month review hearing, the court terminated reunification services for the parents and set a selection and implementation hearing under section 366.26. In support of the 18-month review orders, the court found that the return of the Minors to the parents' custody would create a substantial risk of detriment to the Minors' well-being, and there was not a substantial probability the Minors could be timely returned to the parents' custody and safely maintained in the parents' care.

F. *Changes in Placement and Potential Adoptive Placement Options*

Pending the selection and implementation hearing, the Minors' foster parents gave notice they could no longer care for the Minors. The Minors were placed in a respite home and, thereafter, another new foster home. A potential adoptive placement fell through as well. Given these setbacks, the Agency requested and received two continuances for the selection and implementation hearing in order to complete an assessment and recommendation for a permanent plan for the Minors.

Throughout this period, Mother maintained regular visitations with the Minors. She continued her nonprotective parent sexual abuse classes and denied having contact with Father. Mother reported that "everything [was] 'stacked against [her],' " even though "it [wasn't] even [her] fault," and she

---

[2]    During this timeframe, the Agency did not have any contact with Father despite repeated attempts to reach him.

claimed, "the person who [was] at fault [was] away from everything . . . ." The Agency believed these comments showed Mother did not fully appreciate the protective issues underpinning the proceeding. The Agency also remained concerned about Mother's contacts with Father and her lack of candor about those contacts.

G. *The Section 388 Petitions*

A month before the rescheduled selection and implementation hearing, Mother filed a section 388 petition requesting that the Minors be placed in her care or, alternatively, that she receive additional reunification services. She averred there was a change in circumstances because she completed her nonprotective parenting program, completed her family safety plan, and had a home ready for the Minors. She averred the change in placement would be in the Minors' best interests because they were bonded to her and had asked the social worker if they could return to her care. After a hearing, the court found Mother made a prima facie showing and set an evidentiary hearing. The court also ordered structured unsupervised visitation for Mother.

Soon after, the Agency learned of at least one undisclosed contact between Mother and Father, and possibly two contacts. A social worker previously assigned to the case reported to the currently-assigned social worker that she observed Father sitting in Mother's vehicle at her place of employment. Then, a few days later, the currently-assigned social worker made an unannounced visit to Mother's place of employment and saw Mother and Father together in her vehicle. Mother told the social worker she was "only giving him a ride" and "made a mistake." However, she stated she only met with him to learn his address, which would enable her to serve him with a request for a restraining order.

Based on this encounter, the Agency filed a section 388 petition requesting supervision for Mother's visitations with the Minors. The Agency

10

averred that supervision would be in the Minors' best interests because Mother continued to have contact with Father, which in turn put the Minors' safety at risk. After a hearing, the court found the Agency made a prima facie showing on its section 388 petition and set an evidentiary hearing for the same date as the evidentiary hearing on Mother's section 388 petition.[3]

At the contested hearing on the parties' section 388 petitions, the court received into evidence Agency reports and court appointed child advocate reports. It also received into evidence several attachments submitted with Mother's section 388 petition, including a progress report from Mother's nonprotective parenting program, a family safety plan, photographs of Mother's apartment, and observation notes from Mother's visitations with the Minors.

Mother testified at the contested hearing. She testified her last contact with Father was when she gave him a ride. She testified he approached her by happenstance while she was exiting a retail store, and asked her for a ride. She testified she gave him a ride because she hoped to learn information from him that would allow her to serve him with a request for a restraining order.

Mother admitted she had numerous other contacts with Father during the dependency proceeding and tried to conceal those contacts. She admitted Father appeared in the unsupervised video call with her, even though he only had supervised visitation rights. She admitted she lied to the social worker who visited her apartment and found Father hiding inside in a closet. She admitted she failed to tell the Agency when she rekindled her romantic relationship with Father, as well as when he appeared at her home

_____

[3]    A few weeks later, Mother filed a request for a restraining order against Father. The court denied the request for reasons that are not apparent from the record.

11

intoxicated and punched the window of her vehicle.  However, she maintained that she did not want any more contact with Father.  She testified she installed a video doorbell at her apartment for security and would call the police if he showed up there.

J.C. testified at the contested hearing as well.  She testified she felt "good and a little bad" about the idea of returning to Mother's care.  She testified it was "kind of hard to know" whether Father would come to the home while she was there, and there was a "fifty-fifty" chance Mother would have contact with Father.  J.C. believed they should do "some trials" and "see how those go" before they permanently returned to Mother's care.

The court received stipulated testimony from A.C. into evidence.  In A.C.'s stipulated testimony, he said he felt "amazing" about Mother's request to have them live with her.  He stated he felt safe with her and he was not worried Father would come around.  A.C. also testified in-person at the contested hearing.  He testified he missed Mother and wanted to live with her.

The social worker testified that the Agency opposed Mother's section 388 petition because it had concerns about her contacts with Father and lack of candor about those contacts.  She testified there was an ongoing concern that Mother's contacts with Father could expose the Minors to future harm.

After receiving the documentary and testimonial evidence, the juvenile court denied Mother's section 388 petition and granted the Agency's section 388 petition.  It found Mother's testimony concerning her latest, supposedly coincidental run-in with Father outside a retail store was a "lie."  According to the court, the contact was "consistent with a pattern of contact" between the parents and Mother simply "got busted."  The court found Mother did not show changed circumstances and her credibility regarding her ability to

12

protect the Minors was "more than suspect." In sum, the court found there was "no credible evidence that the children [would be] protected" in her care.

III

DISCUSSION

A. *Legal Standards*

Mother and A.C. appeal two section 388 orders: (1) the order denying Mother's request for placement of the Minors in her care or, alternatively, additional reunification services; and (2) the order granting the Agency's request for supervision during Mother's visitations.

Under section 388, any parent or person with an interest in a dependent "may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1).) The petitioner bears the burden of proving, by a preponderance of the evidence, two elements: (1) there is new evidence or a substantial change of circumstances; and (2) the proposed modification would be in the child's best interests. (*In re J.M.* (2020) 50 Cal.App.5th 833, 845 (*J.M.*).)

With respect to the first element, "[t]he change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.' " (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615; see *In re N.F.* (2021) 68 Cal.App.5th 112, 120 ["The change in circumstances supporting a section 388 petition must be material."]; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 ["To support a section 388 petition, the change in circumstances must be substantial."].)

With regard to the second element, there is " 'a rebuttable presumption that continued foster care is in the child's best interests' " when a change in custody is sought after reunification services have been terminated. (*J.M.*, *supra*, 50 Cal.App.5th at p. 847.) In such cases, "the parents' interest in the

care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability . . . .' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Further, circumstances that are merely *changing* (as opposed to *changed*) can result in a delay in the selection of a permanent home, meaning they do " 'not promote stability for the child or the child's best interests.' " (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206; accord *In re J.C.* (2014) 226 Cal.App.4th 503, 527 [the child's "best interests are not to further delay permanency and stability in favor of rewarding Mother for her hard work and efforts to reunify."].)

Generally, we review an order on a section 388 petition for abuse of discretion. (*In re I.B.* (2020) 53 Cal.App.5th 133, 152–153.) " 'The appropriate test for abuse of discretion is whether the [juvenile] court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the [juvenile] court.' " (*Id.* at p. 153.)

B. *The Court Did Not Err by Denying Mother's Section 388 Petition*

Mother contends she established a substantial change in circumstances and showed that placement of the Minors in her care would be in their best interests. A.C. does not present any arguments concerning Mother's section 388 petition, but joins the arguments raised in Mother's appellate briefs.

Mother asserts there were substantial changed circumstances warranting a change in placement because she satisfied the components of her service plan, including by creating a safety plan, completing a nonprotective parent sexual abuse class, and securing a permanent home. We applaud Mother for making progress on these laudable goals and observe that she clearly has put in significant time and effort toward achieving family reunification. Nonetheless, we agree with the Agency that the juvenile court did not abuse its discretion in finding that these developments, standing

14

alone, failed to establish a material change in circumstances supporting a change in the Minors' placement or additional services.

Although Mother completed formal programming and created a safety plan intended to reduce the risk that her children will be sexually abused, she had repeated contacts with Father, the very person who sexually abused her daughter. She failed to disclose these contacts to the Agency and, in some cases, affirmatively lied to the Agency and the juvenile court about them. These contacts continued even after Mother filed her section 388 petition. The court did not err in finding that Mother's ongoing contacts with her daughter's sexual abuser, and her efforts to conceal those contacts, demonstrated that there were no material changed circumstances warranting placement of the Minors in her care or additional services.

To recount, Mother's dishonesty with the Agency started at the beginning of the dependency proceeding when she minimized Father's alcohol consumption. At that time, Mother stated Father "would only drink once or twice a month" because he did not have money to pay for alcohol. However, after Mother and Father rekindled their relationship, and then broke up again, Mother disclosed that Father had been drinking alcohol throughout the proceeding and neither parent had been truthful with the Agency about his drinking habits.

When Mother made these disclosures, she agreed to maintain strong boundaries with Father and not allow him back into her life. These commitments were short-lived. Just a few months later, both parents appeared together on an unsupervised video call with the Minors, in violation of the juvenile court's order requiring supervision for Father's visitations. Additionally, Mother sought to conceal Father's presence by telling the

15

Minors to be quiet so their foster mother would not be alerted to Father's presence.

Mother had another undisclosed contact with Father the next day at her apartment. When the social worker visited the apartment, Mother affirmatively lied to the social worker and said Father was not there. The social worker discovered Father only after conducting a thorough search of the apartment and finding him hiding inside in a closet.

Mother's dishonesty continued after Father's sexual abuse of J.C. (and Mother's alleged knowledge of the abuse) came to the Agency's attention. Immediately after the detention hearing on the subsequent petitions, Mother told the social worker she had not seen or spoken with Father. This too was untrue. Mother and Father had gotten into a domestic dispute two weeks earlier when Father showed up intoxicated at her apartment and tried to punch out the window of her vehicle.

Finally, evidence was introduced showing Mother had contacts with Father—and tried to conceal her contacts—after she agreed to follow a safety plan prohibiting her from contacting him, and after the court halted reunification services. In particular, a social worker previously assigned to the case reported observing Father sitting in Mother's vehicle at her place of employment. Then, a few days later, the currently-assigned social worker saw both parents inside her vehicle. Mother told the social worker, and later the court, that the contact was a happenstance encounter. She claimed she merely spoke with Father to try to facilitate service of a request for a restraining order. However, the court discredited Mother's testimony on these issues and instead found she "got busted" in a lie. It added that Mother's credibility concerning her ability to protect the Minors was "more than suspect."

16

In short, Mother had repeated undisclosed contacts with her daughter's sexual abuser and then exhibited dishonesty with both the Agency and the juvenile court about those contacts. Her continuing contacts and dishonesty started early in the case and persisted after reunification services were terminated and, in at least one instance, even after she filed her section 388 petition. These contacts and Mother's lack of candor suggest there is a substantial risk they will continue in the future, which would in turn place the Minors at an unacceptable risk of future harm should they be returned to her care. They also demonstrate that further reunification services are unlikely to remediate the very serious sexual abuse issues at play here.

For all these reasons, we conclude the juvenile court acted within its discretion in finding that Mother failed to carry her burden of establishing a material change in circumstances. Because Mother failed to carry her burden on the changed circumstances prong, it is unnecessary for us to assess whether she met her burden on the best interests prong.

C. *The Court Did Not Err by Granting the Agency's Section 388 Petition*

A.C. contends the juvenile court abused its discretion by granting the Agency's section 388 petition, thus requiring supervision during Mother's visitations with the Minors. He does not dispute the Agency proved there were material changed circumstances, or new evidence, to support the petition. On the contrary, he concedes Mother's most recent encounter with Father was "a significant new fact." However, A.C. claims the Agency failed to establish that supervised visitation would be in his bests interests. Mother does not raise any arguments concerning the Agency's section 388 petition, but joins the arguments raised in A.C.'s appellate briefs.

A.C. fails to establish that the juvenile court abused its discretion when it impliedly found that supervised visitations would be in A.C.'s best interests. As discussed in great detail above, Mother has shown a continued

17

propensity to have contacts with her daughter's sexual abuser and then to conceal those contacts from others. She permitted Father to attend an unsupervised video call with the Minors, notwithstanding a juvenile court order requiring supervision during his visitations. These consistent contacts suggest Mother may continue to engage with Father in the future, potentially during unsupervised visitations with the Minors. Undoubtedly, Father's presence at unsupervised visitations would jeopardize the health and safety of both J.C. (his sexual abuse victim) and her brother.

A.C. emphasizes a number of factors that, in his view, minimize the likelihood that Father will endanger his safety during unsupervised visitations with Mother. For instance, he notes the family has a safety plan in place and Mother has taken steps to increase security such as installing a video doorbell at her apartment. However, these security measures do not alleviate the significant possibility that Mother may *willingly* permit Father to contact herself or the Minors in her care, as she has in the past.

A.C. also emphasizes that he is a strong advocate for his interests and is capable of reporting any interactions with Father to his attorney, the Agency, or other interested parties. We do not doubt A.C.'s fortitude. Both J.C. and A.C. have demonstrated remarkable resilience in the face of difficult circumstances. But we cannot agree with A.C. that it is in his best interests to accept the risk of harm associated with unsupervised visitations because he may be capable of reporting such harm after the fact.

Finally, A.C. makes a handful of arguments that are not pertinent to the juvenile court's order granting the Agency's section 388 petition. He argues he desires placement with Mother. He also claims he is approaching the age at which he could prevent an adoption from taking place. While these arguments may have relevance to the question of A.C.'s placement,

18

they are inapposite to whether the court abused its discretion by mandating supervision during Mother's visitations.

Because A.C. has failed to demonstrate an abuse of discretion, the order granting the Agency's section 388 petition is affirmed.

IV

DISPOSITION

The orders are affirmed.


McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


DO, J.

19